### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER HOOPER and HOOPER CONSULTING, LLC,<br><br>Defendant. | No. |

### COMPLAINT

Plaintiff, the United States of America (the "United States"), on behalf of its agency, the U.S. Small Business Administration ("SBA"), hereby files this Complaint against Christopher Hooper and Hooper Consulting, LLC to recover damages pursuant to 15 U.S.C. § 636(b) based upon Mr. Hooper's receipt and misuse of COVID-19 funds.

### SUMMARY OF THE ACTION

1. This is a civil action against Christopher Hooper and his company, Hooper Consulting, for the misuse of COVID-19 funds. Between March 2020 and October 2021, Mr. Hooper, individually or through Hooper Consulting, received nearly $850,000.00 in CARES Act relief, including $827,000 as a COVID-19 Economic Injury and Disaster Loan ("EIDL").

2. Despite acknowledging his obligation to use the loan proceeds "solely as working capital to alleviate economic injury," and despite EIDL Loans requiring timely repayment, Mr. Hooper failed to make required monthly payments and instead utilized the EIDL funds for prohibited purposes, while also comingling government and business funds in his business account, utilizing them for personal expenses.

3. Through these various transactions, and while he failed to make his required monthly payments, Mr. Hooper dwindled his business account from over $1,000,000.00 to less than $90,000.00, at which time, he sought a hardship application from SBA to reduce his monthly obligated repayment from $4,085.00 per month to $409.00 per month.

4. Among the transactions that Mr. Hooper made with EIDL funds included purchasing more than $50,000 in stock through an E*TRADE account, transferring $200,000 to a personal Morgan Stanley account, paying another $165,000 to Bevara LLC, a Portland-based spa, and withdrawing hundreds of thousands of dollars by bank check to himself.

5. The instant action accordingly seeks one-and-one half times the original principal amount of the loan, or $1,240,500.00. 15 U.S.C. § 636(b); 13 C.F.R. § 123.9.

## THE PARTIES

6. Plaintiff, the United States of America, guarantees and funds certain loans through the SBA.

7. At all times relevant to the Complaint, Defendant Christopher Hooper was a resident of Cape Elizabeth, Maine.

8. At all times relevant to the Complaint, Defendant Hooper Consulting, LLC was a Maine single-member limited liability company with a principal place of business located at 40 Cross Hill Road, Cape Elizabeth, ME 04107.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the claims brought by the United States pursuant to 28 U.S.C. §§ 1331, 1345 and 15 U.S.C. § 636(b).

10. At all times relevant hereto, Mr. Hooper was a resident and citizen of the State of Maine.

11. At all times relevant hereto, Hooper Consulting was registered in, transacted business in, and had a principal place of business in the State of Maine.

12. Venue is proper in this District under 28 U.S.C. §§ 1391(b), 1391(c), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## APPLICABLE LAW & REGULATIONS

13. Coronavirus disease 2019 (COVID-19) is a contagious disease, which spread worldwide, resulting in the COVID-19 pandemic by early 2020. Efforts to limit and mitigate the spread of COVID-19 included travel restrictions, lockdowns, business restrictions, temporary business closures, and mask mandates.

14. The Coronavirus Aid, Relief and Economic Security Act ("CARES Act") was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans suffering the economic effects caused by the COVID-19 Pandemic. One source of relief provided by the CARES Act was the COVID-19 EIDL program.

15. Under the COVID-19 EIDL program, the SBA offered two types of funding. The first type, COVID-19 EIDL loans, which were low-interest, fixed-rate, long-term loans intended to help overcome the effects of the COVID-19 pandemic by providing working capital to meet operating expenses, including payroll, rent/mortgage, utilities, and other ordinary business expenses, and to pay business debt incurred at any time. The second type, EIDL Emergency Advances, were funds that could be awarded to COVID-19 EIDL loan applicants that were meant to serve as an "advance" on the

applicant's COVID-19 EIDL loan. The EIDL Emergency Advances were intended to provide immediate relief to small businesses experiencing a temporary loss of revenue.

16.     To receive an EIDL Emergency Advance, the COVID-19 EIDL loan applicant did not need to accept the loan or be approved for the loan to receive an advance; the applicant need only to have an existing COVID-19 EIDL loan application pending. The SBA did not require EIDL Emergency Advances to be repaid to the SBA, even if the underlying COVID-19 EIDL loan application subsequently was denied.

17.     Unlike PPP loans, which were funded by participating lenders and guaranteed by the SBA, EIDL loans and EIDL Emergency Advances were submitted directly to, processed by, and made by the SBA.

18.     Further distinguishing EIDL loans from PPP loans, PPP loans were eligible for full or partial forgiveness. By contrast, EIDL loans (though not EIDL Emergency Advances) were simply that—loans—which were not forgivable. Full repayment, plus interest, was required.

**ALLEGATIONS**

19.     Mr. Hooper, through his business Hooper Consulting, made use of the available CARES Act funds. Rather than using these funds for their intended purposes—providing relief to individuals and businesses impacted by the COVID-19 pandemic—Mr. Hooper used the CARES Act funds, in part, on prohibited uses and for his personal financial benefit.

20.     Mr. Hooper formed Hooper Consulting as a single member limited liability company in 2018. The stated business purpose was "profession or business management consulting, including all activities incidental thereto, and to conduct such other business as determined by the Manager of the Company."

21. For at least the years 2019-2025, Mr. Hooper provided consulting services to, and later was employed by, a renewable energy company headquartered in Florida.

22. Because Mr. Hooper worked for this same company before, during, and after the COVID-19 Pandemic, Hooper Consulting maintained sufficient working capital to meet operating expenses.

23. As evidence of the lack of a legitimate business need for CARES Act funding, rather than requesting a specific amount of an EIDL loan to meet operating expenses, Mr. Hooper requested $133,000.00 on or about March 30, 2020. In support of that request, he claimed that in 2019, Hooper Consulting had incurred $32,000.00 in expenses. In truth, those expenses were reimbursed, resulting in no discernable unreimbursed expenses.

24. Nonetheless, Mr. Hooper subsequently requested even more EIDL funding, ultimately asking the loan officer to provide him with the "max amount" he was eligible to receive.

25. Mr. Hooper was provided an additional $367,000.00 in June 2021 and a final $327,000.00 in October 2021, totaling $827,000.00 in EIDL funding to Hooper Consulting.

26. Mr. Hooper was the only member or employee of Hooper Consulting. Hooper Consulting had no assets nor unreimbursed business expenses.

27. With the loans funded, Mr. Hooper's first monthly payment of $4,085.00 was due in June 2022, twenty-four months from the date of his original EIDL disbursement. At that time, Hooper Consulting had more than $900,000.00 in its bank account—more than enough to cover the entirety of its outstanding EIDL obligation.

28. Mr. Hooper failed to start the timely repayment of his EIDL loan. In fact, by November 2022, the SBA sent emails and letters to Mr. Hooper reminding him that payment was due. By February 2023, the SBA continued to attempt to contact Mr. Hooper, at that point informing him that, pursuant to the EIDL agreement terms of default, his account as delinquent and full payment of the entire loan amount was now due.

29. Despite continued outreach, the first time that SBA was successful in contacting Mr. Hooper regarding repayment was in April 2023, when the SBA spoke with Mr. Hooper who acknowledged understanding that he needed to begin repayment. Notwithstanding this conversation, Mr. Hooper still did not commence repayment.

30. By September 2023, the SBA sent a "Final Notice of Delinquency," and the loan was internally marked as "charged off" because Mr. Hooper had "failed to respond to all collection efforts."

31. At that point, Mr. Hooper should have been making monthly payments against his $827,000 EIDL loan for more than a year. Yet even then, Mr. Hooper failed to commence repayment and instead, in October 2023, he wrote himself a check from Hooper Consulting's account for $31,907.84.

32. This began a series of transactions where Mr. Hooper transferred large sums out of Hooper Consulting's account, while failing to repay his EIDL loan, the entirety of which was now due, and instead used funds for purposes that are prohibited under the terms of the EIDL program.

33. For example, Mr. Hooper transferred $200,000 to his Morgan Stanley account, transferred another $165,000 to Bevara LLC, a Portland-based spa, and purchased more than $50,000 in stock through an E*TRADE account.

34. Mr. Hooper finally made his first monthly repayment to SBA in March 2024—nearly two years late.

35. Still, Mr. Hooper continued making large withdrawals, including $112,627.40 on April 3, 2024, and $69,828.51 on May 2, 2024, both by bank check, which he deposited into his personal Key Bank account.

36. Mr. Hooper missed his April 2024 payment to the SBA, made another monthly payment in May 2024, and then made no further repayments toward his full obligated payment.

37. Instead, in August 2024, Mr. Hooper called the SBA indicating that he wanted to enroll in its hardship program.

38. The SBA hardship program would allow borrowers to make reduced monthly payments for a set term. Specifically, if granted a first or second hardship, the borrower is required to pay a minimum of 10% of the monthly payment amount. Third and fourth hardships are also available, reducing monthly payments to 50% and 75% of the monthly payment amount respectively. Thus, by enrolling in SBA's hardship program, Mr. Hooper was able to reduce his monthly payments from $4,085.00 per month to $409.00 per month.

39. By the time Mr. Hooper submitted his hardship application, he had, through calculated withdrawals, transfers, and purchases which benefitted him personally, dwindled the account balance for Hooper Consulting from more than $900,000.00 to less than $90,000.00.

40. In addition to the large transfers noted above, Mr. Hooper also utilized the funds in the Hooper Consulting business account for personal purposes, including

paying more than $10,000 to Land Rover, nearly $70,000 to a high-end interior designer, and another $26,000 for home improvements.

41. On May 16, 2025, an agent for the Internal Revenue Service interviewed Mr. Hooper. During this interview, Mr. Hooper conceded that he had moved EIDL funds from the Hooper Consulting account and transferred them into his E*TRADE account "to make some money off the funds."

42. Also during this interview, Mr. Hooper admitted to using funds from Hooper Consulting to invest in Bevara LLC.

43. Though Mr. Hooper denied being related to anyone at Bevara LLC, its filings with the Maine Secretary of State indicate that Bevara LLC lists Mr. Hooper's home address as its "Principal Home Office Address." Further, in Bevara LLC's 2025 Annual Report, Mr. Hooper is listed as the only member, manager, or authorized person on behalf of the company.

44. Pursuant to the EIDL loan agreement and federal law, however, Mr. Hooper agreed that he "will use all the proceeds of this Loan **solely as working capital to alleviate economic injury**." (emphasis supplied).

45. More specifically, EIDL funds were to be used for capital and normal expenses of existing business operations. The funds could not be used for expanding facilities or starting new businesses nor for personal financial gain.

46. By investing in a new business, namely Bevara LLC, as well as by attempting to personally profit from the EIDL funds by investing through his E*TRADE account, Mr. Hooper misused EIDL funds.

## COUNT I
## Misuse of EIDL Funds
## 15 U.S.C. § 636(b); 13 C.F.R. § 123.9

47. Paragraphs 1 through 46 are realleged as though fully set forth herein.

48. Mr. Hooper was obligated by the Loan Authorization and Agreement as well as by federal law to "use all the proceeds" of his EIDL loan "solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter...."

49. Contrary to this requirement, Mr. Hooper utilized EIDL funds to invest in a new business, specifically Bevara LLC, and for personal financial gain by using EIDL funds to trade stock via his E*TRADE account.

50. The penalty for misuse of EIDL funds is one-and-one half times the original principal amount of the loan. 15 U.S.C. § 636(b); 13 C.F.R. § 123.9.

51. Because of Mr. Hooper's misuse of EIDL funds, the United States is therefore entitled to $1,240,500.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States requests that judgment be entered in its favor and against Defendants for $1,240,500.00, together with all such relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case pursuant to Federal Rule of Civil Procedure 38(b) of all claims and issues so triable.

Dated: September 15, 2025      Respectfully submitted,

CRAIG WOLFF
Acting United States Attorney

By:    */s/ Trevor H. Taniguchi*
Trevor H. Taniguchi
Assistant United States Attorney
U.S. Attorney's Office
100 Middle Street
Portland, ME 04101
(207) 780-3257
Trevor.Taniguchi@usdoj.gov
*On behalf of the United States*